UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| RICHARD T. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:10-cv-14 |
| | ) | |
| v. | ) | Honorable Robert Holmes Bell |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

This is a social security action brought under 42 U.S.C. §§ 405(g), 1383(c)(3) seeking review of a final decision of the Commissioner of Social Security finding that plaintiff was not entitled to disability insurance benefits (DIB) and supplemental security income (SSI) benefits. Plaintiff filed his applications for benefits on December 9, 2003, alleging a September 27, 2002 onset of disability.[1]  (A.R. 80-82, 514-16).  Plaintiff's disability insured status expired on December 31, 2007.  Thus, it was his burden on his DIB benefits claim to submit evidence demonstrating that he was disabled on or before December 31, 2007.  *See Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Plaintiff's claims for DIB and SSI benefits were denied on initial review.  (A.R. 40-44, 519-22).  On September 12, 2006, he received a hearing before an administrative law judge

---

[1]SSI benefits are not awarded retroactively for months prior to the application for benefits. 20 C.F.R. § 416.335;  *see Kelley v. Commissioner*, 566 F.3d 347, 349 n. 5 (3d Cir. 2009); *see also Newsom v. Social Security Admin.*, 100 F. App'x 502, 504 (6th Cir. 2004).  The earliest month in which SSI benefits are payable is the month after the application for SSI benefits is filed.  Thus, January 2004 is plaintiff's earliest possible entitlement to SSI benefits.

(ALJ), at which he was represented by counsel.  (A.R. 581-608).  On March 26, 2007, the ALJ issued a decision finding that plaintiff was not disabled.  (A.R. 32-39).  On March 31, 2008, the Appeals Council vacated the ALJ's decision and remanded the matter for further administrative proceedings. (A.R. 66-67).  On February 12, 2009, plaintiff received a hearing before an ALJ, at which he was represented by counsel.  (A.R. 609-52).  On March 3, 2009, the ALJ issued a decision finding that plaintiff was not disabled.  (A.R. 13-23).  On November 4, 2009, the Appeals Council denied review (A.R. 5-7), and the ALJ's decision became the Commissioner's final decision.

On January 7, 2010, plaintiff filed his complaint seeking judicial review of the Commissioner's decision denying his claims for DIB and SSI benefits.  The issues raised by plaintiff are as follows:

1.     Did the ALJ commit reversible error when he found that plaintiff's depression did not meet or equal the criteria of listing 12.04?

2.     Did the ALJ commit reversible error by giving little, if any, weight to the opinions of a consultative psychologist and plaintiff's treating mental health therapists?

3.     Did the ALJ violate SSR 96-8p "in not considering the effect of the plaintiff's chronic neuropathic chest pain on his ability to work?"

(Statement of Errors, Plf. Brief at 7, docket # 9).  Upon review, I find that plaintiff's arguments do not provide a basis for disturbing the Commissioner's decision.  I recommend that the Commissioner's decision be affirmed.

## Standard of Review

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law.  *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124,

125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).  Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The scope of the court's review is limited.  *Buxton*, 246 F.3d at 772.  The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations.  *See  Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  . . .  This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73.  "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently."  *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996) ("[E]ven if the district court -- had it been in the position of the ALJ -- would have decided the matter differently than the ALJ did, and even if substantial evidence also would have supported a finding other than the one the ALJ made, the district court erred in reversing the ALJ.").  "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see  Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

### Discussion

The ALJ found that plaintiff met the disability insured requirement of the Social Security Act from September 27, 2002, through December 31, 2007, but not thereafter. (A.R. 15). Plaintiff had not engaged in substantial gainful activity on or after September 27, 2002. (A.R. 15). Plaintiff had the following severe impairments: "history of [a September 27, 2002] chest stab wound/punctured lung; post-traumatic stress disorder (PTSD); mood disorder; and a history of alcohol abuse, in current remission per subject." (A.R. 15). The ALJ found that plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments. (A.R. 18-19).

The ALJ found that plaintiff retained the residual functional capacity (RFC) for a limited range of light work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) in that he can lift or carry up to 20 pounds occasionally and 10 pounds frequently; and he can stand, walk or sit for at least six hours of an eight-hour workday. However, he cannot climb ladders, scaffolds or ropes; and can only occasionally squat, crawl, kneel, stoop, ramp or stair climb. In addition, the claimant is limited to simple unskilled work with an[] SVP rating of 1 or 2 that involves only one, two or three-step instructions; work that requires only minimal contact or interaction with co-workers; work involving minimal contact with, and minimal direction from, a supervisor; work that entails only brief and superficial public contact; and work that does not require being in close proximity of others.

(A.R. 19).

The ALJ found that plaintiff's testimony regarding his subjective limitations was not fully credible:

> The claimant alleged an inability to work as a consequence of physical and mental ailments. The claimant averred enduring right-sided chest pain that resulted from a stabbing. The claimant reported shortness of breath with sustained exertional activity. The claimant alleged experiencing a depressed and anxious mood, nightmares, intrusive thoughts and fear. The

claimant indicated that some of his emotional difficulties were tied to such trauma as being shot (1986), stabbed (2002), and being struck in the head with a baseball bat (2004).  The claimant reported a past history of misuse of illicit drugs, but none for a lengthy interval.  He reported misuse of alcohol, but none since December 2007.  According to the claimant, his conditions limited his ability to lift heavy objects, stand, walk, concentrate, feel comfortable around others (particularly women), or persist on tasks.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce such symptoms.  However, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible to the extent that they are inconsistent with the above residual functional capacity assessment.

In particular, no physician imposed a work preclusive limitation on the claimant's functioning.  The undersigned notes the results of imaging and clinical evaluations that do not unveil totally debilitating profound pathology.  Tomogram studies were negative for hilar or mediastinal lymphadenopathy, pleural effusion, focal consolidation or persistent pneumothorax.  The claimant commonly displayed clear lung fields and no pulmonary sequelae.  The claimant does not require accessory muscle use for respiration.  Clinicians observed the claimant to ambulate normally without an assistive device and to retain functional range of motion.  The record discloses no neurological dysfunction manifested by the claimant, and no musculoskeletal or extremity abnormalities such as deformity, clubbing, cyanosis, edema, heat, discoloration, ulceration, diminished pulsation or atrophic changes.  The claimant averred some recent problems with left eye vision.  However, the record does not indicate that his ability to perform basic work tasks is hampered by this condition, and certainly not for the requisite period of 12 consecutive months.

Concerning his psychological status, there have been a variety of GAF scores assigned to the claimant ranging from 45 (by social workers Hansen and Wagner-Kullik)[A.R. 345, 386-414], to 49 (consultative examiner Strang)[A.R. 539], to 50 (VA psychiatrist C. Solano-Lopez, M.D.)[A.R. 421].  Dr. Solano-Lopez's appraisal was predicated on diagnoses including alcohol intoxication, alcohol abuse and a depressive disorder.  The claimant testified that he stopped drinking after he was discharged from the VA hospital in January 2008 [A.R. 625-26], and it is reasonable to conclude that his ability to function (as well as his GAF score) was enhanced when he was not misusing ethanol.  The GAF scores of Dr. Strang and the social workers seem arbitrarily low based on consideration of all the medical and other evidence.  The narratives and clinical signs and findings listed by the clinicians divulge less serious dysfunction than that indicated by the GAF scores.  Specifically, the claimant was commonly found to be well oriented, coherent and spontaneous; he demonstrated preserved general cognition, memories and attentiveness, and no evidence of ongoing thinking disorder.  The record reflects, and the claimant acknowledged, that he did receive beneficial results from therapy when he participated in it, and he stated that psychotropic medication continued to provide positive effects on his mood and sleeping

ability.   Amazingly, though the social worker progress notes referenced variable presentations by the claimant, the GAF rating was never modified.  Further contradicting Strang's and the social workers' GAF scores is the fact that the claimant has not found it necessary to involve himself in counseling or outpatient psychotherapy for a good portion of the period at issue, and none over the past year.

During the hearing, the claimant presented quite well and answered the questions in an appropriate and fairly straightforward manner.  The claimant seemed somewhat vague about his use of illicit substances.  He denied use for a number of years, yet, VA notes suggest a positive cocaine test in December 2007 [A.R. 453].  In any event, the overall evidence in the record simply does not suggest or establish that the claimant lacks suitable concentration, memory, adaptive, basic cognitive or interpersonal skills for vocational involvement that is simple, routine and somewhat isolated in nature, as depicted by the residual functional capacity adopted.  The evidence does not fully support the claimant's contentions as to the magnitude of his symptomology and dysfunction, including his expressed degree of social interaction intolerance.  The claimant visits with family, and for some of the pertinent period used public transportation, went shopping (he stated that his mother does most of the shopping now), attended religious services, ate meals at the Salvation Army and a local church.  Though he denied the accuracy of the references, within the record were reports that the claimant was living for some period of time with a significant other.  The claimant maintained that he had always lived with his mother, yet the record indicates that he moved for at least some time to the Kalamazoo area, before returning to Battle Creek.  Moreover, the record indicates that the claimant prepared simple meals, cleaned the kitchen and did some laundry.  Furthermore, the claimant helped care for his mother's dog, watched a good deal of television, read a bit, and enjoyed constructing plastic models (Exhibits C1E, C12E, C12F, C19F)[A.R. 113-20, 187-94, 419-88, 541].

The undersigned does not assign controlling weight to the opinion of treating physician Dr. Mar that the claimant has no limitations with the exception of the inability to perform heavy lifting.  The totality of the evidence persuades the undersigned that the claimant is limited to sustained work within the confines of the light residual functional capacity defined heretofore.  In reaching a conclusion in this case, the undersigned considered the assessments made by Disability Determination clinicians and consultants.  The undersigned has not given controlling weight to the opinions of the nonexamining physicians.  However, after careful evaluation of the entire record, the undersigned finds that their opinions are substantially supported and largely consistent with the record as a whole, particularly the conclusion that plaintiff is not disabled under the Act.

(A.R. 20-22).  Plaintiff was unable to perform his past relevant work.  (A.R. 22).  Plaintiff was 39

years old as of his alleged onset of disability, 44 years old when his disability insured status expired,

and 45 years old as of the date of the ALJ's decision.  Thus, at all times relevant to his claims for

DIB and SSI benefits, plaintiff was classified as a younger individual.  (A.R. 22).  Plaintiff has at

least a high school education and is able to communicate in English. (A.R. 22).  The ALJ found that

the transferability of jobs skills was not material to a disability determination.  (A.R. 22).  The ALJ

then turned to the testimony of a vocational expert (VE).  In response to a hypothetical question

regarding a person of plaintiff's age, and with his RFC, education, and work experience, the VE

testified that there were approximately 30,100 jobs in Michigan's Lower Peninsula that the

hypothetical person would be capable of performing.  (A.R. 643-45).  The ALJ found that this

constituted a significant number of jobs.  Using Rule 202.21 of the Medical-Vocational Guidelines

as a framework, the ALJ held that plaintiff was not disabled.  (A.R. 22-23).

## 1.

Plaintiff argues in hyperbolic terms that the ALJ "cherry picked the record" and

committed reversible error when he found that plaintiff's depression did not meet or equal the

requirements of listing 12.04:

> Plaintiff's testimony[2] and notes from his many sessions in group therapy are to the effect that
> he has had severe limitations in maintaining a social life which under any reasonable
> interpretation would equal "*marked*".  (AR 386-414)  The same with the ability to
> concentrate and persist.  He is frequently a prisoner in his mother's house because of
> unreasonable paranoid fears of harm if he is outside which would seem to meet the "C"
> criteria also.
>
> A fair reading of plaintiff's medical evidence of record ("MER"), shows that upon every
> GAF assessment, he was scored at 45 to 50 which indicates serious effects of his mental
> disease.  Even the State Agency consultive examiner, Dr. Timothy Strang, Ph.D. found
> serious mental limitations (GAF of 49).  (AR 536-540) The ALJ attempts to justify the
> opposite opinion by cherry picking the MER in his effort to justify his outrageous review of
> the evidence.

---

[2]The ALJ's finding that plaintiff's testimony was not fully credible is addressed in section
2(C).

(Plf. Brief at 10-11).  I find that plaintiff's arguments are meritless.  The ALJ's opinion accurately summarizes the administrative record.  His findings that plaintiff did not meet or equal the requirements of listing 12.04 are supported by more than substantial evidence.  The subjective GAF scores emphasized by plaintiff were not entitled to any particular weight.

> A.    "Cherry Picking"

Plaintiff argues that the ALJ cherry-picked the administrative record in order to portray his condition in a positive light.  (Plf. Brief at 11; Reply Brief at 1).  This argument is frequently made and seldom successful, because "the same process can be described more neutrally as weighing the evidence."  *White v. Commissioner*, 572 F.3d 272, 284 (6th Cir. 2009).  The narrow scope of judicial review of the Commissioner's final administrative decision does not include re-weighing evidence, deciding questions of credibility, or substituting the court's judgment for that of the ALJ.  *See Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *see also Vorholt v. Commissioner*, No. 09-6404, 2011 WL 310700, at * 7  (6th Cir.  Feb. 2, 2011).  It is pellucid that the ALJ did not "cherry pick" this administrative record.

Plaintiff was a crack cocaine dealer.[3]  (A.R. 247-48).  In 1986, a girlfriend shot him in the abdomen.  (A.R. 265, 332).  He was incarcerated from 1996 to 1999 on a felony conviction for delivering and manufacturing crack cocaine.  (A.R. 247, 328).  He was sentenced to 3-to-20 years' imprisonment, but ended up serving only two and one-half years.  (A.R. 617-18).  Plaintiff claims a September 27, 2002 onset of disability.  On that date, he was stabbed in the chest by an ex-girlfriend.[4]  Emergency room records reveal that plaintiff's blood alcohol level was 0.260.  He had an uneventful recovery and was discharged on October 4, 2002.  (A.R. 209-229, 380-85).

---

[3]Plaintiff argues that the ALJ was required to find that he was disabled before considering his drug and alcohol abuse. (Plf. Brief at 13).  He is incorrect.  The ALJ was free to consider all the evidence in the administrative record in making his factual findings.  *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3); *see also Boseley v. Commissioner*, 397 F. App'x 195, 199 (6th Cir. 2010); *Coldiron v. Commissioner*, 391 F. App'x 435, 442 (6th Cir. 2010)("An ALJ may consider all the medical and nonmedical evidence.").

Although plaintiff's record of drug and alcohol abuse did not hamstring the ALJ, it does pose a significant additional barrier to plaintiff's claim of entitlement to social security benefits.  Since 1996, the Social Security Act, as amended, has precluded awards of SSI and DIB benefits based upon alcoholism and drug addiction.  *See* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); 20 C.F.R. §§ 404.1535, 416.935; *see also Bartley v. Barnhart*, 117 F. App'x 993, 998 (6th Cir. 2004); *Hopkins v. Commissioner*, 96 F. App'x 393, 395 (6th Cir. 2004).  If plaintiff had supplied evidence sufficient to establish his disability, he would have then faced the additional hurdle of demonstrating that his alcohol and drug abuse were not contributing factors to his disability.  *See Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir. 2007); *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999); *see also Zarlengo v. Barnhart*, 96 F. App'x 987, 989-90 (6th Cir. 2004).  The "key factor" in determining whether drug use or alcoholism is a contributing factor material to a determination of disability is whether the claimant would still be disabled if he stopped using drugs or alcohol.  20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1).  This is determined by taking the plaintiff's mental and physical restrictions based on the entire record and then removing the limitations based on drugs or alcohol. If the remaining limitations are not disabling, drug addiction or alcoholism is material to the determination of disability.  20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2).  Because plaintiff was found not to be disabled, the ALJ was not required to decide the issue of whether substance abuse was material to a finding of disability.

[4]The woman who stabbed plaintiff is the mother of his two oldest children.  (A.R. 246, 327, 636-37).

-9-

On March 22, 2004, Kenneth Lombardi, M.D., found no medical explanation for plaintiff's chest pain complaints. Plaintiff stated that he had a heart murmur, but no murmur was detected. Dr. Lombardi found no evidence of any muscle wasting in plaintiff's upper and lower extremities. Plaintiff was "able to get dressed, get undressed, and get off and on the examining table without any difficulty whatsoever." (A.R. 230-32).

On April 27, 2004, plaintiff was examined at the Family Health Center (FHC) of Battle Creek[5] by Aye Mar, M.D. Plaintiff reported smoking a pack of cigarettes per day for more than twenty years. He denied drinking alcohol and using street drugs. (A.R. 367, 372). He was oriented to time, place and person. His physical examination was unremarkable. Plaintiff complained of pain and tenderness around his old stab wound scar. Dr. Mar found no medical cause. He prescribed ibuprofen and Vicodin in response to plaintiff's pain complaints. (A.R. 367). Plaintiff's chest x-rays returned normal results. (A.R. 364, 369). On May 3, 2004, plaintiff reported that he had not taken the prescribed medication and continued to experience chest discomfort. He indicated that the pain was worse when he was doing work or tried to lift things. Dr. Mar stated that plaintiff should avoid lifting heavy weights, but had no other restrictions. (A.R. 364). Dr. Mar scheduled a CT scan and advised plaintiff to take his medication. (A.R. 364). The CT scan returned normal results. (A.R. 360). On May 27, 2004, plaintiff reported that the ibuprofen, Zantac, and Vicodin ES that Dr. Mar had prescribed helped with chest pain, but he expressed a desire to see "somebody else" for a determination whether he had "any damage in his chest or not." (A.R. 358). Dr. Mar referred plaintiff to a pain clinic (A.R. 358), but plaintiff never appeared at the clinic for

---

[5]Plaintiff gave a medical history indicating that he had been hospitalized in Kalamazoo on June 4, 2003, after being stabbed in the arm. (A.R. 371). There are no supporting hospital records.

his May and June appointments. (A.R. 357). Plaintiff made repeated statements asserting that in mid-2004 a woman hit him in the head with a baseball bat (A.R. 324, 332, 345, 597-98, 639), but he did not submit any contemporaneous medical records.

The earliest mental health care record plaintiff submitted in support of his claims for DIB and SSI benefits is a Summit Pointe/Behavioral Health Resources "Customer Assessment (Initial)" dated December 28, 2004. (A.R. 341-45). Plaintiff appeared at Summit Pointe on self-referral complaining of depression and anxiety. (A.R. 345). He related that he had been shot in 1986, stabbed in 2002, and hit with a baseball bat in 2004. He reported nightmares and difficulty sleeping. He was "fearful of going out." He stated that he was self-isolating, felt worthless and hopeless, and had no energy. He indicated that he was often irritable and claimed that he recently started experiencing panic attacks. He gave a negative response to every alcohol-related question on Summit Pointe's intake questionnaire. (A.R. 341). He made no mention of his drug-related felony conviction. Social worker Hansen offered a diagnosis of post traumatic stress disorder and gave plaintiff a "current" GAF score of 45. (A.R. 339, 345). Plaintiff's treatment at Summit Pointe was group therapy. (A.R. 336). Social workers at Summit Pointe persistently gave plaintiff the same GAF score from January 2005 through June 2006 despite changes in his presentation.[6] (A.R. 345, 386-414; see A.R. 280-323).

On March 22, 2005, plaintiff complained of depression and grief related to the recent death of his brother and requested a trial of antidepressant medication. Dr. Mar provided him with

-----

[6]On February 7, 2005, plaintiff related that he had "been in jail for 14 days . . . for a really old driving on suspended [license] or some such charge." (A.R. 413). On September 12, 2006, he testified that he had lost his driving privilege years earlier after he was "caught driving under the influence." (A.R. 587). Plaintiff is not eligible to receive social security benefits for any months he was confined in jail or prison. 42 U.S.C. § 402(x)(1)(A).

a prescription for Lexapro.  (A.R. 354, 504).  On April 26, 2005, plaintiff reported that he had stopped taking Lexapro because it did not help and requested a different medication.  Dr. Mar prescribed Prozac.  (A.R. 352, 503).  On August 5, 2005, plaintiff reported some improvement with Prozac, but requested an increased dosage.  Dr. Mar acceded to this request.  (A.R. 350, 502).  Plaintiff reported to Dr. Mar that he had seen Dr. Shaird "for his chronic R chest pain, and neuropathic pain w/history of stab wound and R hemothorax in 10/02.  He was instructed to take Neurontin 300 mg t.i.d. which did not help.  He is going to see him again for F/U."  (A.R. 350, 502).  Plaintiff did not submit any medical records from Dr. Shaird.

    On September 12, 2006, plaintiff testified that he was in constant fear for his life because he had been shot, stabbed, and hit in the head with a bat.  (A.R. 597).  Plaintiff conceded that he had not required any overnight hospitalizations or emergency room visits within the preceding twelve months.  (A.R. 594).  He testified: "I'm seeing a therapist every Thursday at Summit Point[e] in Battle Creek."  (A.R. 269, 594).  He did not disclose to the ALJ that he had stopped attending group therapy sessions at Summit Pointe one month earlier.  (A.R. 415).  Summit Pointe discharged plaintiff as a patient because he failed to appear for any therapy sessions after August 17, 2006.  (A.R. 415).

    On June 5, 2007, plaintiff returned to Dr. Mar's office complaining of depression.  Dr. Mar noted that plaintiff "didn't see any physician at FHC for more than 1 yr."  (A.R. 500).  Plaintiff reported that he was "frustrated about his SS disability."  (A.R. 500).  He stated that weeks earlier he had contemplated suicide, but "got rid of [the] gun."  (A.R. 500).  Dr. Mar provided

-12-

plaintiff with prescriptions for Paxil[7] and Klonapin and advised him to follow up at Summit Pointe. (A.R. 501). Dr. Mar prescribed gabapentin in response to plaintiff's complaints of atypical chest pain. (A.R. 501). On October 16, 2007, plaintiff returned to Dr. Mar for a follow-up examination. Dr. Mar's progress notes state as follows: "He didn't take Paxil for a while since he moved to KZ [Kalamazoo], but now he is back to BC [Battle Creek]." (A.R. 496). Plaintiff reported that Paxil "didn't help much." (A.R. 496). Dr. Mar noted that even without medication plaintiff displayed appropriate judgment and insight. He was oriented to person, place and time, and displayed normal recent and remote memory. (A.R. 496).

On December 27, 2007, plaintiff appeared at the Battle Creek Veterans Administration Medical Clinic.[8] He sought admission because he was "stressed out" and had fleeting thoughts of using a gun to commit suicide. The triage nurse noted a strong odor of alcohol coming from plaintiff, which a breathalyzer test confirmed. (A.R. 278, 335). Plaintiff denied using drugs or alcohol. (A.R. 247). He "admitted that he was a dealer, but never used crack." (A.R. 247). Plaintiff later conceded his frequent use of alcohol (A.R. 252-53, 257, 259, 265, 274, 459), but he persistently denied use of illegal drugs. (A.R. 252-53, 267, 272, 274, 278, 421, 465, 467, 473, 475, 485). His urine tested positive for cocaine. (A.R. 453). VA records state that plaintiff "was not forthcoming about his drug and alcohol use" and "is involved in crack cocain[e]." (A.R. 248).

---

[7]Paxil is a brand name of paroxetine hydrochloride. *See Physician's Desk Reference*, 1491 (65th ed. 2011); *see also Vanderwerf v. SmithKline Beecham Corp.*, 603 F.3d 842, 843 (10th Cir. 2010).

[8]Plaintiff did not have combat-related post traumatic stress disorder. His service in the 1980's was "in the Reserves and National Guard only." (A.R. 423).

Plaintiff's physical examination was unremarkable.  He reported that he smoked one-half pack of cigarettes per day.  (A.R. 275).  Upon examination, his lungs were clear, with no rales, ronchi or wheezing.  His cardiovascular function was normal.  He did not have edema.  His grip strength was good bilaterally.  He walked with a normal gait.  (A.R. 276).  Doctors advised plaintiff to stop smoking cigarettes and drinking alcohol.  (A.R. 258, 430).

Plaintiff gave the VA conflicting responses regarding his residence.  He occasionally reported that he had been living with his mother for three years (A.R. 247), but more often stated that he had been living with a girlfriend of fifteen years.  (A.R. 251, 262, 265, 268, 269, 271, 334, 458, 460, 470, 472, 476-77, 479).  Plaintiff never married, but is the father of five children.  (A.R. 246).  He stated that he maintained long-term relationships with friends, but had difficulty making new ones.  (A.R. 248).  He admitted that he had the ability to maintain relationships within his own home or other familiar settings.  He acknowledged that he was able to maintain concentration to the extent that he was able to "effectively follow" movies and television programs.  (A.R. 268).

On January 7, 2008, plaintiff stated, "I'm kinda depressed because I don't drink or have a drug problem."  (A.R. 437).  He reported that he did not feel ready for any vocational services because he was following up on his social security disability claim.  (A.R. 245, 437).  He stated that he enjoyed going to the gym and exercising.  He had no difficulty interacting with different groups or gym members.  (A.R. 436).  His "main goal [was] to continue to try to collect SSD."  (A.R. 248).  Plaintiff was discharged from the VA clinic on January 8, 2008.  Doctor Solano-Lopez noted that plaintiff's main goal remained trying to collect social security disability.  Plaintiff's diagnosis at discharge was acute alcohol intoxication (resolved), alcohol abuse, and a depressive disorder, not

otherwise specified.  (A.R. 421-22).  Doctor Solano-Lopez gave plaintiff a GAF score of 50.  (A.R. 421, 423, 428-29).

On May 14, 2008, Psychologist Timothy Strang conducted a consultative mental status examination.  (A.R. 536).  This examination took less than one hour and no tests were performed.  When Strang inquired about plaintiff's legal problems, plaintiff replied: "Just trouble for loud talking to police, swearing."  (A.R. 537).  Plaintiff stated that he was not currently in therapy, "but indicated his willingness to 'sign up with Summit Pointe.'" (A.R. 536).  He denied having any problems with alcohol abuse and reported that he did not use street drugs.  (A.R. 537).  Based on plaintiff's statements, Strang offered a diagnosis of post-traumatic stress disorder and a major depressive disorder, single episode, severe with psychosis.  He gave plaintiff a GAF score of 49.  (A.R. 539).

On December 12, 2008, Dr. Mar treated plaintiff for conjunctivitis involving his left eye.  Plaintiff displayed appropriate judgment and insight.  He was oriented to person, time and place.  He had normal recent and remote memory.  Plaintiff stated that he was depressed about the denial of his disability claims.  Dr. Mar suggested that plaintiff go to Summit Pointe.  Plaintiff "deferred to go." (A.R. 244).  Dr. Mar provided him with prescriptions for paroxetine hydrochloride and clonazepam.  He also supplied a gabapentin prescription for "neuralgia." (A.R. 244).  On December 16, 2008, plaintiff reported continued trouble with his left eye and Dr. Mar referred him to an ophthalmologist.  Plaintiff stated that he had smoked three packs of cigarettes per day for approximately ten years.  Dr. Mar gave him information on smoking cessation.  (A.R. 242).

On December 16, 2008, plaintiff was examined by Dr. Colquhoun at the Southwest Michigan Eye Center.  Plaintiff's left eye problem was diagnosed as uvetic keratitis.  On January 12,

2009, Dr. Colquhoun noted that plaintiff's eye was responding to treatment.  Plaintiff reported some symptomatic relief and his intraocular pressure had improved from 30 to 22.  (A.R. 568-74). Plaintiff's January 29, 2009 chest x-ray indicated a possible "tiny" upper lobe nodule.  (A.R. 567). Dr. Colquhoun attempted to schedule a CT scan, but had difficulty contacting plaintiff at the address and telephone number provided.  He "strongly recommend[ed]" that plaintiff stop smoking.  (A.R. 565-66).

On February 12, 2009, plaintiff testified that he no longer drank alcohol or used marijuana or cocaine.  (A.R. 625-26).  He testified that he was an occasional smoker, smoking only "one or two cigarettes" per day.  (A.R. 625).  He stated that he spent "10 to 12 hours" per day watching television.  (A.R. 633).  He testified that he had been living with his mother since 2001 and that all the medical records stating that he had been living with a girlfriend were inaccurate.  (A.R. 637).

The ALJ's summary of the record is accurate.  Plaintiff's argument that the ALJ "cherry picked" the administrative record is utterly frivolous.

B.   GAF Scores

Plaintiff argues that the ALJ failed to give adequate weight to the GAF scores supplied by consultative psychologist Strang and social workers Hansen and Wagner-Kullik.  (Plf. Brief at 11-14; Reply Brief at 1-2).  This argument is meritless.  The subjective GAF scores were not entitled to any particular weight.  The ALJ determined that they were entitled to little weight because they were arbitrarily low and inconsistent with the record as a whole.

The ALJ was not required to give any weight to the GAF scores.  *See Kornecky v. Commissioner*, 167 F. App'x 496, 511 (6th Cir. 2006).  "GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations."  *White v. Commissioner*, 572 F.3d 272, 276 (6th Cir. 2009).  A GAF score is a subjective rather than an objective assessment:

> [GAF score is] a subjective determination that represents the clinician's judgment of the individual's overall level of functioning.  It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood.  A GAF of 41 to 50 means that the patient has serious symptoms ... or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.

*White v. Commissioner*, 572 F.3d at 276.  "GAF is a clinician's subjective rating of an individual's overall psychological functioning.  A GAF score may help an ALJ assess mental RFC, but it is not raw medical data.  Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning."  *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007); *see Kornecky*, 167 F. App'x at 503 n.7.  The DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS' (DSM-IV's) explanation of GAF scale indicates that "a score may have little or no bearing on the subject's social and occupational functioning."[9]  *Kornecky*, 167 F. App'x at 511; *see Oliver v. Commissioner*, No. 09-2543, 2011 WL 924688, at * 4 (6th Cir. Mar. 17, 2011).

---

[9]"Significantly, the SSA has refused to endorse the use of the GAF scale."  *Bennett v. Commissioner*, No. 1:07-cv-1005, 2011 WL 1230526, at * 3 (W.D. Mich. Mar. 31, 2011).  GAF scores "have no direct correlation to the severity requirements of the mental disorder listings."  *DeBoard v. Social Security Admin.*, 211 F. App'x 411, 415 (6th Cir. 2006).

Further, the opinions of plaintiff's social workers were not entitled to any particular weight because they are not "acceptable medical sources," *see* 20 C.F.R. §§ 404.1513(a), (d), 416.913(a), (d), and their opinions are not "treating-source" opinions. *See* 20 C.F.R. §§ 404.1502, 416.902 ("*Treating source* means your own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."); *see also Smith v. Commissioner*, 482 F.3d 873, 876 (6th Cir. 2007). Only "acceptable medical sources" can: (1) provide evidence establishing the existence of a medically determinable impairment; (2) provide a medical opinion; and (3) be considered a treating source whose medical opinion could be entitled to controlling weight under the treating physician rule. *See Titles II and XVI: Considering Opinions and Other Evidence from Sources Who are not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies*, SSR 06-3p (reprinted at 2006 WL 2329939, at * 1 (SSA Aug. 9, 2006)). Social workers are not acceptable medical sources. *Payne v. Commissioner*, 402 F. App'x 109, 118-19 (6th Cir. 2010). The opinions of social workers fall within the category of information provided by "other sources." 2006 WL 2329939, at * 2; *see* 20 C.F.R. §§ 404.1513(d), 416.913(d). The social security regulations require that information from other sources be "considered." 2006 WL 2329939, at * 1, 4 (citing 20 C.F.R. §§ 404.1512, .1527, 416.912, .927). This is not a demanding standard and was obviously satisfied here.

The ALJ gave little weight to the GAF scores suppled by the social workers and Psychologist Strang because they were arbitrarily low and inconsistent with the record as a whole. (A.R. 21). The social workers always gave plaintiff the same GAF score, ignoring the changes in his presentation. The level of restriction suggested by Strang and the social workers was inconsistent

with the record evidence that plaintiff was generally coherent, well oriented, spontaneous, and demonstrated preserved general cognition, memories and attentiveness. The ALJ's finding that the GAF scores were entitled to little weight is well-reasoned and supported by more than substantial evidence.

C.   Listing 12.04

Plaintiff argues that the ALJ committed reversible error when he found that plaintiff's depression did not meet or equal the requirements of listing 12.04. (Plf. Brief at 10-11; Reply Brief at 1). Upon review, I find no error.

"At step three [of the sequential analysis],[10] an ALJ must determine whether the claimant's impairment meets or is equivalent in severity to a listed mental disorder. The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the SSA considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. In other words, a claimant who meets the requirements of a listed impairment will be deemed conclusively disabled." *Rabbers v.*

---

[10]"Administrative law judges employ a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Social Security Act." *Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004). Under the sequential analysis, "The claimant must first show that []he is not engaged in substantial gainful activity. Next, the claimant must demonstrate that []he has a 'severe impairment.' A finding of 'disabled' will be made at the third step if the claimant can then demonstrate that h[is] impairment meets the durational requirement and 'meets or equals a listed impairment.' If the impairment does not meet or equal a listed impairment, the fourth step requires the claimant to prove that []he is incapable of performing work that []he has done in the past. Finally, if the claimant's impairment is so severe as to preclude the performance of past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed. The burden shifts to the Commissioner at this fifth step to establish the claimant's ability to do other work." *White v. Commissioner*, 572 F.3d at 282; *see Lindsley v. Commissioner*, 560 F.3d 601, 602-03 (6th Cir. 2009).

*Commissioner*, 582 F.3d 647, 653 (6th Cir. 2009) (internal quotations and citations omitted).  It is well established that a claimant must show that he satisfies all the individual requirements of a listing.  *See Elam*, 348 F.3d at 125.  "If all the requirements of the listing are not present, the claimant does not satisfy that listing." *Berry v. Commissioner*, 34 F. App'x 202, 203 (6th Cir. 2002); *see Elam*, 348 F.3d at 125.

Listings for mental impairments generally begin with paragraph A criteria -- a statement describing the disorder addressed by the listing (a set of medical findings) -- followed by the paragraph B criteria -- a set of impairment-related functional limitations.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. Listing 12.04 is one of four mental impairment listings containing paragraph C criteria (a second set of impairment-related functional limitations). *Id.*  "The requirements in paragraphs B and C describe impairment related functional limitations that are incompatible with the ability to do any gainful activity." *Id*.  A claimant meets the requirement of the listing for affective disorders  "when the requirements in both A and B are satisfied, or when the requirements in C are satisfied."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  Plaintiff has been diagnosed with an affective disorder, and it is assumed for present purposes that he met the part A criteria.

Paragraph B requires that an affective disorder result in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B);  *Rabbers v. Commissioner*, 582 F.3d at 658.  The ALJ found that plaintiff did not meet or equal the paragraph B requirements because he had mild

restriction in daily activities, moderate difficulties in social functioning,[11] moderate difficulties with

concentration, persistence or pace, and no episodes of decompensation:

> The claimant's mental impairments, considered singly or in combination, do not meet or medically equal the criteria of Listings 12.04 or 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked deficiencies in maintaining social functioning; marked deficiencies in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. A marked restriction means a limitation that is more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within one year, or an average of once every four months, each lasting for at least two weeks.
>
> In terms of limitations stemming from his mental impairments, the claimant has "mild" restrictions in activities of daily living (performed adaptive functions such as simple cooking and cleaning, laundry, caring appropriately for personal grooming and hygiene); "moderate" difficulties in maintaining social functioning (does not feel comfortable around others but generally communicates and interacts adequately with others; exhibits essentially normal speech and language patterns; functions in some social settings e.g. uses public transportation /receives meals at Salvation Army/church; and "moderate" deficiencies of concentration, persistence or pace in completing tasks in a timely manner (reads; attends to personal finances; no profound cognitive dysfunction in terms of awareness, orientation, concentration or memories). There are "no" documented episodes of decompensation of extended duration[.]"

(A.R. 18-19). Plaintiff does not seriously engage any of the above-quoted findings. He offers a

conclusory argument that "any reasonable interpretation" of his testimony and group therapy notes

would have resulted in findings of "marked" levels of restriction in social functioning and

concentration, persistence or pace. (Plf. Brief at 10). The ALJ found that plaintiff's testimony

regarding his subjective functional limitations was not fully credible. Mental health records that are

merely a restatement of the patient's own subjective history are of limited utility, because it is the

---

[11]A "marked" limitation is a degree of limitation that is more than moderate, but less than extreme. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C); *see Sullenger v. Commissioner*, 255 F. App'x 988, 993 (6th Cir. 2007).

ALJ's job to determine the claimant's credibility.  *See Siterlet v. Secretary of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir.1987); *accord Francis v. Commissioner*, No. 09-6263, 2011 WL 915719, at * 2 (6th Cir. Mar. 16, 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").  Opinions based on the claimant's reporting of his symptoms are not entitled to any particular weight.  *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Smith v. Commissioner*, 482 F.3d 873, 876-77 (6th Cir. 2007).  The ALJ's findings that plaintiff had only "moderate" difficulties in maintaining social functioning and concentration, persistence or pace are supported by more than substantial evidence.  Plaintiff did not meet or equal the part B requirements of listing 12.04.

Plaintiff's entire argument with regard to part C of listing 12.04 consists of a statement that he is "frequently a prisoner in his mother's house because of his unreasonable paranoid fear of harm if he is outside which would seem to meet the 'C' criteria also." (Plf. Brief at 11).  This argument is not supported by any legal authority, factual development or meaningful analysis.  Issues raised in a perfunctory manner are deemed waived. *See Geboy v. Brigano*, 489 F.3d 752, 767 (6th Cir. 2007); *see also Anthony v. Astrue*, 266 F. App'x 451, 458 (6th Cir. 2008).

Assuming that the issue had not been waived, it is meritless.  The ALJ found that plaintiff did not satisfy any of the part C criteria.  (A.R. 19).  Paragraph C of listing 12.04 contains the following requirements:

C.  Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

-22-

1.    Repeated episodes of decompensation, each of extended duration; or

2.    A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.    Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C).    Part C(1) requires repeated episodes of decompensation of extended duration.[12]  Plaintiff had no episodes of decompensation of extended duration.  (A.R. 19).  Plaintiff did not satisfy part C(2) because there is no evidence of a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C)(2); *see Gilbertson v. Astrue*, No. 09-1824, 2010 WL 5690391, at * 20 (D. Minn. Sept. 20, 2010); *Corson v. Astrue*, 601 F. Supp.2d 515, 528-29 (W.D.N.Y. 2009).  Even assuming that the ALJ had credited plaintiff's testimony about living with his mother rather than a girlfriend, it would not have satisfied part (C)(3), which requires a "current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."  A highly supportive living arrangement refers to "shelters or group homes, inpatient psychiatric treatment, or an inability to live on one's own." *Gonsalves v. Astrue*, No. 09-181, 2010 WL 1935753, at * 4 (D. Me. May 10, 2010); *see Rosic v. Commissioner*, No.1:09-cv-1380, 2010 WL 3292964, at * 7 (N.D. Ohio Aug. 19, 2010).

---

[12] Repeated episodes of extended duration means at least three episodes during one year, or an average of one per four-month period, each lasting at least two weeks.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4); *see Monroe v. Astrue*, No. 09-cv-3338, 2011 WL 98972, at * 8 (C.D. Ill. Jan. 12, 2011); *Pugh v. Astrue*, No. 1:09-cv-112, 2010 WL 1544271, at * 6 (E.D. Tenn. Feb. 17, 2010).

Plaintiff's living arrangements were not within the "highly supportive" category. He did not meet or equal the requirements of listing 12.04. I find no basis for disturbing the Commissioner's decision.

## 2.

Plaintiff argues that the ALJ violated SSR 96-8p by not considering the effect of his chronic neuropathic chest pain on his ability to work. (Plf. Brief at 14-16). I find that the ALJ complied with the requirements of SSR 96-8p and that his factual findings regarding plaintiff's credibility and RFC are supported by more than substantial evidence.

### A.     Dr. Shaird

Plaintiff makes the following argument regarding his chest pain: "Claimant has such chest pain and it has been diagnosed as neuropathic pain by Dr. John Shaird. (AR 350)." (Plf. Brief at 15). Among the more obvious problems with this argument is the lack of supporting medical evidence from Dr. Shaird. For reasons that are not explained, plaintiff elected not to submit any records from Dr. Shaird in support of his claims for DIB and SSI benefits. Instead, he relies on his own August 2005 statement to Dr. Mar about a diagnosis purportedly made by Dr. Shaird. (A.R. 350). Plaintiff's statement cannot establish Dr. Shaird's diagnosis, nor the evidence on which it was based. Plaintiff did submit pharmacy records indicating that Dr. Shaird gave him prescriptions for gabapentin in August and November 2005. (A.R. 234). This may or may not have been intended by Dr. Shaird as treatment for neuropathic pain.[13] Dr. Mar, a treating physician, supplied plaintiff

---

[13]Gabapentin is an anticonvulsant that is generally prescribed for treatment of seizure disorders and postherpetic neuralgia, but it is also used in the treatment of alcohol and cocaine withdrawal. *See* http://medicinenet.com/gabapentin/article.htm (last visited June 1, 2011). "Case

with gabapentin prescriptions, apparently as treatment for neuralgia.  (A.R. 234, 236, 238,-39, 244).
Dr. Mar believed that plaintiff's only limitation was that he could not perform work at the heavy
exertional level.  Assuming that Dr. Shaird made a diagnosis that plaintiff's reported chest pain was
neuropathic in origin, it would not undermine the substantial evidence supporting the ALJ's findings
that plaintiff retained the RFC for a limited range of light work, and that his subjective complaints
were not fully credible.

B.      RFC

The ALJ found that plaintiff retained the RFC for a limited range of light work.  RFC
is the most, not the least, a claimant can do despite his impairments.  20 C.F.R. §§ 404.1545(a)(1),
416.945(a)(1); *Griffith v. Commissioner*, 217 F. App'x 425, 429 (6th Cir. 2007).  This is a point of
emphasis throughout SSR 96-8p.[14]  *Policy Interpretation Ruling Titles II & XVI: Assessing Residual
Functional Capacity in Initial Claims*, SSR 96-8p (reprinted at 1996 WL 374184, at * 2, 4 (SSA July
2, 1996)).

Plaintiff quotes a small portion of SSR 96-8p for the unremarkable proposition that
in assessing plaintiff's RFC, the ALJ was required to consider all his impairments, "even those that

---

reports describe gabapentin misuse in patients with prior histories of substance abuse and
dependency; either to deal with cravings or abstinence symptoms or as a substitute for substances
such as cocaine."   http://dpic.org/article/professional/gabapentin.abuse-htm (last visited June 1,
2011).

[14]"Social Security Rulings do not have the force and effect of law, 'but are binding on all
components of the Social Security Administration' and represent 'precedent final opinions and
orders and statements of policy and interpretations' adopted by the Commissioner."  *Ferguson v.
Commissioner*, 628 F.3d 269, 272 n.1 (6th Cir. 2010)(quoting 20 C.F.R. § 402.35(b)(1)).  The Sixth
Circuit has "refrained from ruling whether Social Security Rulings are binding on the Commissioner
in the same way as social security regulations, but assume[s] that they are."  *Ferguson*, 628 F.3d at
272 n.1.

are not severe." 1996 WL 374184, at * 5. He then argues that the ALJ "neglected to consider" the combined effects of his severe impairments and his non-severe chronic neuropathic chest pain. (Plf. Brief at 15). Plaintiff's argument cannot withstand scrutiny. The ALJ stated that he considered the combined effect of plaintiff's severe and non-severe impairments. Given this statement, the ALJ was not required to further elaborate on his thought process. *See Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). Plaintiff's real disagreement is with the ALJ's factual finding regarding his credibility.

C.      Credibility

         Plaintiff argues that his chest pain "varies in presence and intensity" and that it substantially limits his "ability to perform work duties on concentration and regular attendance." (Plf. Brief at 15). Credibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ. *See, e.g.*, *Gooch v. Secretary of Health & Human Servs.*, 833 F.2d at 592. It is the ALJ's function to determine credibility issues. *See Siterlet v. Secretary of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The court does not make its own credibility determinations. *See Walters v. Commissioner*, 127 F.3d at 528; *see McGlothin v. Commissioner*, 299 F. App'x 516, 523-24 (6th Cir. 2008). The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the deferential "substantial evidence" standard. "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005). "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476. "The ALJ's findings as to a claimant's

credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge h[is] subjective complaints." *Buxton v. Halter*, 246 F.3d at 773. "Since the ALJ has the opportunity to observe the demeanor of the witness, his conclusions with respect to credibility should not be discarded lightly and should be accorded deference." *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993); *see White v. Commissioner*, 572 F.3d at 287.

The ALJ's opinion contains a lengthy discussion of the medical evidence, plaintiff's subjective complaints, and the numerous reasons why the ALJ found that plaintiff's testimony was not fully credible. (A.R. 15-22). It should be obvious that a reasonable factfinder would have numerous grounds to question plaintiff's credibility. The ALJ's factual finding regarding plaintiff's credibility is supported by more than substantial evidence, and the ALJ gave a more than adequate explanation why he found that plaintiff's testimony was not fully credible. *See Rogers v. Commissioner*, 486 F.3d 234, 247-49 (6th Cir. 2007).

### Recommended Disposition

For the reasons set forth herein, I recommend that the Commissioner's decision be affirmed.

Dated:   June 3, 2011                          /s/  Joseph G. Scoville
                                                         United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). General

objections do not suffice. *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).